1  John R. Manning
   Attorney at Law
2  Ca. St. Bar No. 220874
   1111 H Street, Suite 204
3  Sacramento, CA  95814
   Telephone:  (916) 444-3994
4  jmanninglaw@yahoo.com

5  Attorney for Defendant
   SHAROD GIBBONS

6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA,      )   NO.: 15-CR-158-3 JAM
                                  )
11          Plaintiff,            )   DEFENDANT'S SENTENCING
                                  )   MEMORANDUM
12      v.                        )
                                  )   Date:  November 28, 2017
13                                )   Time:  9:15 a.m.
                                  )   Judge: Hon. John A. Mendez
14 SHAROD GIBBONS                 )
                                  )
15          Defendant.            )
   _____)

16

17                    **I.  INTRODUCTION**

18      Pursuant to a Plea Agreement, ShaRod David Gibbons pleaded

19 guilty to violation of Title 18 USC 922(a)(1)(A), Unlawful

20 Manufacturing and Dealing in Firearms, a Class D felony. The

21 United States Probation Office prepared a Presentence Report

22 (PSR) and concluded the advisory United States Sentencing

23 Guideline (USSG) in this case are: Total Offense Level 23;

24 Criminal History Category III (57-60 months).[1]  Ultimately, USPO

25

26

27 _____

28      [1]Mr. Gibbons has no objection to the Guideline calculation
   or other data presented in the PSR.

                              1

1    recommended a sentence of 48 months for Mr. Gibbons.[2]

2       Mr. Gibbons comes before this court humiliated and deeply

3    remorseful.  Mr. Gibbons watched his own parents fall victim to

4    their lesser angels.  He knows first hand what that can do to a

5    child as he has lived with it his whole life. As such, he feels

6    the burden of his own failures as a parent like few others.

7    However, Mr. Gibbons maintains the love and support of his family

8    and community.  He is considered a valued member of his community

9    by those around him as the various character letters clearly

10   demonstrate.  Surely Mr. Gibbons must be punished for his

11   criminal conduct, but a lengthy prison sentence in this matter

12   serves little benefit to society.  Society is far better served

13   in this instance by Mr. Gibbons returning to his family and being

14   the father, husband, friend and citizen everyone who knows him

15   believes him capable of being.  Therefore, Mr. Gibbons

16   respectfully requests the court, after considering the PSR; this

17   memo; information provided by the government; and, the sentences

18   given to the co-defendants, sentence him to "time served"

19   followed by a two year term of supervised release.[3]

20                          **II. BACKGROUND**

21      ShaRod David Gibbons was born in Provo, Utah, on April 23,

22   1983. He is the older of two children born to the marriage of

23   David Gibbons and Ramona Elaine Thrower. David Gibbons was born

24

25      [2]The PSR recommends a downward variance based on "Lack of
     Youthful Guidance." Mr. Gibbons agrees with that analysis, but
26   asks the Court to consider other factors in addition to Lack of
     Youthful Guidance.

27

28      [3]Mr. Gibbons has already served more time in custody than
     either co-defendant despite virtually identical conduct.

                                    2

and raised in Orem, Utah, and owned and operated his own heating
and air conditioning company. A life long member of Alcoholics
Anonymous, David was a sponsor to many who sought sobriety
through AA. Sadly, David could not escape his own mental and
emotional health issues; David took his own life in 2000 at the
age 60.

Ramona Thrower, ShaRod's mother, also died in 2000.  Her
death was the result of liver and kidney failure, artifacts of
her own alcoholism. Born and raised in Vallejo, California,
Ramona was a professional singer and toured as a back up singer
for years with Chaka Khan and other acts. She was just 55 when
she died.

ShaRod has a younger full sister, 32 year old ShaRae
Mitchell. ShaRae is a Business School graduate of the University
of California at Santa Barbara, where she was a four year varsity
basketball player. After graduation, she was an assistant coach
of the UCLA women's basketball team. She now resides in
Livermore, California. She is married to a firefighter and is the
mother of two year old twins. She works as a basketball official
and personal trainer. ShaRae has profound insight into ShaRod's
development and stated:

> "Both of our parents were wonderful, very caring,
> charismatic and successful people but struggled with
> addiction. My brother and I grew up knowing that our
> parents loved us but also knew that any moment things
> could go from being steady to very unpredictable and
> hectic. My father, in particular, got into legal issues
> that involved stealing and reselling items.  . . . My
> brother grew up idolizing my father and emulating his
> every move. He also watched him continuously do things
> that weren't so good. I'm not at all justifying
> ShaRod's behavior but this is what he grew up seeing.
> . . . My brother is just like my father, but with
> greater self-awareness and a stronger moral compass."

3

1    ShaRod also has an older half-brother by his mother, 41 year
2    old Hakim Owens, presently in state prison; a younger half-sister
3    by his father, 24 year old Taylor Gibbons, a personal trainer;
4    and a younger half-brother David, Jr., a recent high school
5    graduate. ShaRod is close to all of his siblings except Hakim.
6    Hakim has several times used ShaRod's name when stopped by the
7    police.[4]

8    ShaRod was living with his parents and younger sister in
9    Utah when, at age 5, his parents separated and divorced. His
10   mother returned to California and her singing career. ShaRod's
11   sister went with their mother. ShaRod remained with his father.
12   Three years later, in 1991, ShaRod's father remarried to Laurie,
13   with whom he had two more children. Laurie was instrumental in
14   raising ShaRod until his father's suicide in 2000.  ShaRod
15   remains close to Laurie Gibbons.

16   Soon after his father died, ShaRod left school to live with
17   and work with his cousins, who owned several sandwich shops in
18   Maine. After several months living and working in Maine, ShaRod's
19   mother announced she was entering an alcohol recovery program.
20   After she detoxified, her health began to deteriorate. Within
21   weeks she died of liver and kidney failure. ShaRod had not yet
22   graduated from high school. Before she died, ShaRod came to
23   California to be with his ill mother. He enrolled in Valley High
24   School, in Elk Grove. ShaRod had only been enrolled for a matter
25   of weeks before his mother died. After her death, ShaRod dropped
26   out of high school and returned to Utah, where he moved in with

27
28   [4] The outstanding warrant noted in Paragraph 52 of the PSR
actually involves Hakim and not ShaRod.

4

1  his paternal grandmother.

2      This was a very difficult time for ShaRod.  He had trouble

3  accepting both his parents were dead. Working only a part time

4  job, lonely and depressed, ShaRod started using drugs. He

5  associated with a negative crowd. After three months of downward

6  spiraling, ShaRod realized he was headed for disaster.  His

7  maternal uncle offered him refuge in Sacramento and ShaRod leapt

8  at the offer.

9      Further insight into ShaRod is provided by his maternal

10  uncle, Pastor Arnold Thrower, who stated:

11      "Sharod and Sharae are my sisters children and came to
        live with us in their early teens after the suicide
12      death of their Dad, David Gibbons and the early demise
        of my sister, Ramona due kidney and liver failure due
13      to alcoholism.  . . . I have known Sharod his whole
        life and at one point 27 years ago lived with in their
14      home in Orem Utah due to my own struggle with cocaine
        addiction after my pro sports career ended. After
15      seeing first hand all Sharod has been through and for
        the most part overcome, I am more than happy to present
16      this letter on his behalf.  . . . Sharod has battled
        his demons with addiction, depression, anger and
17      destructive behavior and has become a husband, father,
        gifted worker and servant in his local Church at STC.
18      Serving in leadership in our witnessing outreach
        ministry, our church security  team and our social
19      media outreach. He also has excelled in his field of
        employment as a radio marketing specialist and even his
20      own small business.  . . . I realize the circumstances
        that has brought Sharod to this point are not good and
21      in many ways stand in contradiction to Sharod's
        standing as a husband, father, employee and Church
22      member but I know in my heart what's in him and what
        his true desire is for his life and family. I also
23      believe this experience is another step and opportunity
        to Sharod's total life change and restoration as a
24      productive member of his family, church and community."

25

26      Life with his uncle offered him stability in a loving,

27  nurturing environment. ShaRod checked himself into a rehab at the

28  Salvation Army and found relief (at least temporarily) from his

addiction.  Life was pretty good for ShaRod and he found a job at
Home Depot.  After approximately a year, when he was about 22,
ShaRod relocated to Maui, Hawaii, seeking a new environment. He
obtained a job in marketing for the Lahaina Store and Grill, a
tourist restaurant. ShaRod remained in Hawaii for almost five
years, working for the restaurant the entire time. In 2007,
during a visit to California, ShaRod met Michelle Mills. They had
a shared experience of both having lost a parent to suicide,
Michelle her mother, ShaRod his father. ShaRod returned to
California to live and pursue a relationship with Michelle.
Today, they are married and have two children, ages 9 and 7.

Michelle was born and raised in Monterey, California. Her
father is a retired Correctional Lieutenant with the California
Department of Corrections and Rehabilitation (CDCR). Michelle
attended California State University Sacramento, where she earned
a Bachelor of Science in Accounting and a Master of Science in
Accounting. She worked for seven years for the California State
Department of Public Health, two years as a legislative analyst
for the California State Association of Counties, and for the
last year as Executive Director of the County Health Care
Executives Association of California. Michelle is an
extraordinarily accomplished professional woman. She and ShaRod
have a son, 9 year old Asaiah, and a daughter, 7 year old Amaya.
They are in the 4th and 2nd grades. The children have done well in
school and are active in community athletics. Their father's
absence, however, is affecting them. The Court is respectfully
referred to the moving letter by Michelle Gibbons. She stated, in
part:

"I do believe my husband is remorseful. He truly is not someone who would EVER intentionally harm anyone and I do not believe he fully thought through the possibilities of his actions. I believe that if released to be with his family, you will not hear about him in the system agin. These past three months away from him has been hard on him, but harder on the kids and I. My children are very high achievers in school. Their third trimester report card was lower expected and I know that it is due to the absence of their father. . . . My son has also been in a couple fights and scuffles this summer, which is very unusual for the happy and caring boy that he is. My daughter has also shown a change emotionally and is very sensitive at all times. We are also trying to navigate through this being very public, where peers and colleagues are learning of the issue. Because of this we, both Sharod and I made the decision that I would take the kids to counseling. We need him home with us. He is a very hands on dad and has been since day one. He is missed and I ask that you please have mercy and allow Sharod to return home quickly."

As indicated herein, ShaRod dropped out of high school before graduating. He had attended Provo High School in Utah before his father's death, and Valley High School in Elk Grove. At both schools, he was on the rugby and football teams. ShaRod completed the GED through Sacramento Adult School, and has taken classes at both Sacramento City College and American River College. He has accumulated approximately two semesters of credit.

Between 2007 and 2013, ShaRod held a series of sales/marketing positions, except for a brief period in 2012, when he was the part time office manager at Spirit and Truth Church. He worked for 16 months for Encore Management, 7 months for Maximum Security, 10 months for Enterprise Car Rental, and 18 months for himself at Gibbons Consulting. All of the positions were in the Sacramento area. He was most successful at Enterprise, where he was promoted to a management position after

1  only a month of employment.

2      In February 2013, ShaRod worked as a patient care
3  coordinator at Western Dental Services, handling billing and
4  scheduling for patients.  He left Western in September 2014 to
5  accept a position as a logistics manager for Batesville
6  Logistics, a support company for Batesville Casket Company. He
7  left that position in 2015.

8      On June 13, 2016, ShaRod began working for "iHeart Media,"
9  owners of six radio stations in the Sacramento region. He was an
10  account executive, selling advertising on each of the six
11  stations, led by KBFK 93.3. At the suggestion of management,
12  ShaRod used his middle name of David for professional purposes.
13  He left the position in April 2017 to accept another sales
14  position at CBS Radio. He terminated that employment when
15  arrested for a pending felony evading charge in Sacramento.

16      ShaRod is 5'7" tall and weighs approximately 150 pounds. At
17  one time he weighed over 200 pounds. In 2008, he was diagnosed
18  with Type I Diabetes and is now insulin dependent. He has also
19  been diagnosed with hypertension and takes medication.

20      ShaRod has had two periods in his life during which he has
21  had substance abuse problems. Shortly after the deaths of both of
22  his parents, ShaRod began associating with a crowd in Utah that
23  were substance users. ShaRod regularly used cocaine and then
24  heroin before fleeing for his life to the relative safety of his
25  uncle's home in California.

26      Unfortunately for ShaRod, his addiction issues came roaring
27  back after undergoing a surgical procedure on his shoulder in
28  2010.  For a three-year period (+/-) ShaRod abused his

8

prescription, opiate,  pain medication. ShaRod went through out-
patient rehab at Kaiser and was prescribed Suboxone to reduce his
opiate dependance.   While not an excuse, it should be noted, the
dates of the conduct at the center of this matter coincide with
ShaRod attempting to address his addiction issues (a second time)
in drug treatment.  The dates also over-lap with ShaRod needing
income to purchase the Suboxone he was prescribed.  Again, the
defense does not offer this information to justify the
defendant's behavior.  Rather, the defense is simply noting the
conduct in this matter coincides with ShaRod struggling with his
addiction and his recovery.

ShaRod's prior arrest record is primarily made up of alcohol
and substance abuse related offenses, including DUI and theft. He
has a pending Felony Evading Police when he was riding his
motorcycle with a group of riders who were speeding. When police
intervened, he sped away. He was tracked by a CHP helicopter and
arrested in May 2017. He had been on Pretrial Supervision for
over two years when this incident took place. He remains in
custody.

Following his arrest in this matter nearly three years ago,
ShaRod did all he could do to atone for his criminal behavior.
Moreover, he was, until his recent arrest, entirely successful,
indeed he thrived, on Pretrial Release.  A sentence of time
served is, in this matter, entirely appropriate and serves the
aims of justice.

### III. APPLICABLE SENTENCING LAW

The landmark decision in *United States v. Booker*, 160
L. Ed. 2d 621, 125 S.Ct. 738 (2005), changed sentencing in the

9

1  Federal Courts.  **Booker**  renders the Guidelines as advisory only,

2  and instructs the sentencing courts to consider the Guidelines in

3  context of all of those factors enumerated in Title 18 USC

4  3553(a) and hand down a sentence that is reasonable.

5        ". . . Section 3553(a) remains in effect, and sets

6        forth numerous factors that guide sentencing. Those

7        factors in turn will guide appellate courts, as they

8        have in the past, in determining whether a sentence is

9        unreasonable." **Booker**, at 660-661.

10       The Supreme Court addressed the issue of the "presumption of

11  reasonableness" of a within Guidelines sentence in **Rita v. United**

12  **States**, 551 S.Ct. 338, 351, 127 U.S. 2456, 168 L.Ed. 2d 203

13  (2007) and instructed that a within Guideline sentence is

14  presumed reasonable only upon **appellate review**. The Court stated:

15       Further, the Court instructed:

16       "The fact that we permit courts of appeals to adopt a
         presumption of reasonableness does not mean that courts
17       may adopt a presumption of unreasonableness. Even the
         Government concedes that the appellate courts may not
18       presume that every variance from the advisory
         Guidelines is unreasonable." at 354.

19

20       In **Nelson v. United States**,129 S. Ct. 890, 892, 172 L.Ed. 2d

21  719 (2009), perhaps as a reminder and definitely for emphasis,

22  the court stated:

23       "Our cases do not allow a sentencing court to presume
         that a sentence within the applicable Guidelines range
24       is reasonable."

25       The Ninth Circuit reiterated this premise in **United States**

26  **v. Edwards**, 595 F.3d 1004, 1015 (9th Cir. 2010) ([Court] cannot

27  presume a sentence is substantively unreasonable only because it

28  falls outside the range recommended by the Sentencing

Commission).

Indeed, in *Irizarry v. United States*, 128 S.Ct. 2198, 2202, 171 L.Ed. 2d 28 (2008), the Court ruled a variance from the sentencing Guideline range did not even require notice to the parties.

The Ninth Circuit was heard on the presumption of reasonableness and directed that even on appeal the presumption of a Guideline sentence may not be reasonable. It stated:

"... A court of appeals may *not* presume that a non-Guidelines sentence is *un*reasonable. Although a court may presume on appeal that a sentence within the Guidelines range is reasonable, *id*, we decline to adopt such a presumption in this circuit." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

The Guideline range is simply the beginning of the analysis for sentencing, not the end. The Ninth Circuit stated:

"'The Guideline's factor may not be given more or less weight than any other.' So while the Guidelines are the 'starting point and initial benchmark' and must 'be kept in mind throughout the sentencing process,' the Guideline's range constitutes only a touch-stone in the district court's sentencing consideration." *United States v. Autery*, 555 F.3d 864, 8172 (9th Cir. 2009)

The Court must now consider 18 USC 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider –

(1)  The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  The need for the sentence imposed --

(a)  to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

11

(b)   to afford adequate deterrence to criminal conduct;

(c)   to protect the public from further crimes of the defendant; and

(d)   to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

The sentencing court is now required to consider factors the Guidelines effectively prohibited from consideration (ie: Age, USSG 5H1.1; Education and Vocational Skills, USSG 5H1.2; Mental and Emotional Condition, USSG 5H1.3; Physical Condition Including Drug or Alcohol Dependence, USSG 5H1.4; Employment, USSG 5H1.5; Family Ties and Responsibilities, USSG 5H1.6; Socio-economic Status, USSG 5H1.10; Civic and Military Contributions, USSG 5H1.11; and Lack of Youthful Guidance, USSG 5H1.12.). **United States v. Ameline**, 409 F.3d 1073, 1093 (9th Cir. 2005) (*en banc*). To consider the "history and characteristics of the defendant," the Court must now consider factors the Guidelines eschewed.

Finally, the Supreme Court has cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. The Court stated:

> ". . . Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." **Gall v. United States**, 128 S.Ct. 586, 599, 169 L.Ed. 2d 445 (2007).

## IV. A SENTENCE SUFFICIENT BUT NOT GREATER THAN NECESSARY

ShaRod acknowledges and takes full responsibility for his decision to become involved in the instant offense. The many

12

letters submitted on his behalf underscore his acceptance of
responsibility and express dismay that he committed these
offenses. They also underscore, however, that his illegal conduct
does not fully describe ShaRod as a person. Each writer has
described ShaRod as a devoted husband and father. The letters
also point out ShaRod has worked continuously since his late
teenage years (and  he has developed skills in sales); been a
caring and attentive father; a loving husband; and, a valuable
member of his community.

There is no doubt ShaRod's behavior is influenced by his
early family dysfunction and the loss of his parents to suicide
and alcoholism. The PSR recognizes this phenomenon and has
recommended a downward variance for "lack of youthful guidance."
ShaRod joins in requesting the Court find such a variance, if not
a greater one, is warranted. In addition to "lack of youthful
guidance," ShaRod requests his extraordinary acceptance of
responsibility, by way of his significant cooperation with
investigators, also warrants consideration for a downward
variance from the Guideline range.  Additionally, the defense
maintains the factors found in 3553(a) further warrant the
sentence requested herein.

Regardless of the sentence the court ultimately settles upon
for ShaRod, he will serve the sentence under far more adverse
conditions than similarly situated defendants.  As noted in the
PSR, there is a warrant out for ShaRod.  However, this warrant
stems from a case wherein Hakim Owen (ShaRod's half brother) was
pulled over in Los Angeles, arrested and allowed to plead guilty
using ShaRod's name.  The warrant was issued because Hakim failed

to appear at a subsequent hearing (after pleading guilty and
being sentenced - all in ShaRod's name).  There is no dispute as
to these facts.  Unfortunately, the warrant remains in the system
pending some resolution in LA County.  Because of the warrant
hold, Mr. Gibbons is ineligible for placement in a Camp facility;
he is ineligible for halfway house transitional living for the
final months of his sentence; his classification within the BOP
is increased; and, he is ineligible for some of the educational
and employment opportunities within the BOP.  Again, this is
entirely due to ShaRod's brother's criminal conduct.

ShaRod respectfully requests this Court find a sentence of
imprisonment for time served is sufficient, but not greater than
necessary, to fulfill the requirements of sentencing. ShaRod has
never been in custody for more than day or two.  Therefore, the
seven months he has spent housed in/at the Sacramento County
Jail, away from his family, is indeed a substantial period of
time. Such a sentence impresses upon ShaRod (and other potential
defendants) the seriousness of his conduct, while  promoting
respect for the law. Moreover, given the sentences of the co-
defendants (five months in custody and two days in custody
respectively), who manufactured and supplied the majority of the
weapons involved herein, a sentence of time served creates no
sentencing disparity among the defendants.[5]

In fact, sentencing ShaRod to anything more than time served
will actually create sentencing disparity in this matter.  The
Beaver's supplied seventeen of twenty-three guns noted in the

[5]However, neither co-defendant appears to have any prior
criminal history.

PSR.  They suppled - as in - manufactured - ALL seventeen AR type
fire arms noted in the PSR.  They were the source of supply.
They admitted to using illegal gun manufacturing as their
livelihood.  ShaRod acted as a "middle-man" and certainly
warrants punishment as such.  However, he should not face more of
a penalty than the individual(s) who manufactured and suppled him
with the majority of the weapons.

     The USSG calculations (with the exception of "criminal
history") should be nearly identical.  The PSR indicates ShaRod's
base offense level is 18 pursuant to USSG 2K2.1(a)(5) and 26
U.S.C. 5845(a).  The weapon(s) sold by ShaRod relevant to the
noted code sections were supplied - indeed they were manufactured
- by the Beavers.  The PSR further indicates a 4 level
enhancement for ShaRod pursuant to USSG 2K2.1(b)(1)(B) (if the
offense involves 8-24 firearms, increase by 4 levels).  The
Beavers supplied 17 of the 23 firearms noted in the PSR (or, 14
of the 20 firearms that were actually sold by ShaRod to the CS);
thus, this same enhancement should apply to the co-defendants.
Finally, the PSR recommends another 4 level enhancement as to
ShaRod pursuant to USSG 2K2.1(b)(5) and USSG 2K2.1 comment (n.13)
(defendant sold more than two firearms to an individual that the
defendant knew or had reason to believe that such conduct would
result in the transport or transfer to another individual who
whose possession or receipt of the firearm would be unlawful...).
Here, the Beavers knew ShaRod was "re-selling" the fire arms.
Obviously, the Beavers were unconcerned with who purchased, or
ended up with, the firearms they manufactured so long as they
were paid.  Perhaps there is a technical argument as to why this

1   enhancement should not apply to the co-defendants, but as a

2   practical matter, the Beavers' conduct is exactly the same as

3   ShaRod's.  Even if the Court believes there is a distinction in

4   the relevant USSG calculations (including criminal history)

5   between ShaRod and the co-defendants, the information provided to

6   the court by the government regarding ShaRod more than adequately

7   compensates for any guideline differences.

8       ShaRod plays a substantial role in his family, as his wife

9   Michelle movingly writes. He is an involved and loving father,

10  whose absence from the family is having a profound impact on his

11  young children. The children are dealing with emotional issues

12  related to the their father's absence and have entered

13  counseling.  ShaRod's daughter is being evaluated for neck

14  surgery.  Though not related to ShaRod's custody status, not

15  being there - even just to hold her hand at the MD's office -

16  punishes Amaya and weighs heavily on ShaRod.

17      ShaRod takes complete responsibility for his criminal

18  conduct, but asks the Court to consider the totality of his

19  circumstances and sentence him to time served.

20      Respectfully submitted,

21   s/John R. Manning
    John R. Manning
22  Attorney for Defendant
    SHAROD GIBBONS

23

24

25

26

27

28